UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: _____, Judge

| | |
|---|---|
| STANLEY BLACK & DECKER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES; JOSEPH R. BIDEN, JR., in his official capacity as PRESIDENT OF THE UNITED STATES; U.S. CUSTOMS & BORDER PROTECTION; TROY A. MILLER in his official capacity as SENIOR OFFICIAL PERFORMING THE DUTIES OF COMMISIONER OF U.S. CUSTOMS & BORDER PROTECTION; UNITED STATES DEPARTMENT OF COMMERCE; and GINA M. RAIMONDO in her official capacity as SECRETARY OF COMMERCE,<br><br>Defendants. | Court No. 21-00262 |

## COMPLAINT

Plaintiff Stanley Black & Decker, Inc. ("Stanley") brings this action through its attorneys, Neville Peterson LLP, and allege as follows:

## STATEMENT OF THE CASE

1.     This case presents the same issue that was resolved by a three-judge panel of this court in *PrimeSource Building Products, Inc. v. United States, et al.*, Ct. No. 20-00032, 21 Ct. Int'l Trade LEXIS 36 (Ct. Int'l Trade April 5, 2021) when it held that then President Donald J. Trump exceeded his authority under Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862) ("Section 232"), when he issued Presidential Proclamation 9980

imposing an additional 25 percent *ad valorem* tariff on imports of so-called "derivative" steel products – expressly including nails -- long after the procedural deadlines proscribing his congressionally delegated authority under Section 232 had expired.  As such, Proclamation 9980 is invalid as contrary to law.

2.       On January 24, 2020, then President Donald J. Trump, claiming authority under Section 232, issued Presidential Proclamation 9980.  *See* 85 Fed. Reg. 5281 (Jan. 29, 2020), attached as Exhibit 1 hereto.[1]

3.       Either directly or through wholly-owned subsidiaries, Stanley is an importer of steel nails, a product identified in Proclamation 9980 as a derivative article of steel subject to the additional 25 percent tariff.  Stanley is adversely affected by Proclamation 9980 because it pays this tariff on its imports of steel nails.  Moreover, Stanley was denied an opportunity to provide input into the President's decision to impose Section 232 duties on imports of nails, as mandated by Section 232, because then Secretary of Commerce Wilbur Ross did not conduct the required investigation into whether derivative steel products – including nails – posed a threat to the national security of the United States or publish a report of the findings of such an investigation.

4.       The President's authority to impose tariffs under Section 232 is proscribed by strict procedural requirements.  Fundamentally, before the President may impose such tariffs, the Secretary of Commerce is required to investigate whether imports of the product at issue threaten the national security of the United States.  After doing so, the Secretary must submit to the President a report of his findings within 270 days of commencing the investigation and publish any non-classified/non-proprietary information in that report in the Federal Register. 19 U.S.C. §

---

[1] Presidential Proclamation 9980 also imposed a 10 percent *ad valorem* duty on "derivative" aluminum products. Stanley is not an importer of derivative aluminum products.  However, because Proclamation 9980 is invalid as a matter of law, it cannot be enforced against derivative articles of aluminum.

1862(b)(3).  If the Secretary's report concludes that the subject imports do pose a threat to national security, then the President must decide within a 90-day period whether he or she agrees with the Secretary's report and, if so, announce the nature and duration of any remedial action. *Id.;* 19 U.S.C. § 1862(c)(1)(B).

5.     Neither the Secretary of Commerce nor the President complied with the procedural requirements of Section 232 prior to issuing Proclamation 9980.  The Secretary of Commerce did not investigate whether imports of derivative steel products, including nails, threatened to impair the national security.  He did not submit the required written report to the President, nor did he cause such a report to be published in the Federal Register.  The President's issuance of Proclamation 9980 in the absence of such a report was unlawful because the statutory deadlines for Presidential decision and implementation passed without the required action by the Secretary of Commerce.

6.     The President and the Secretary of Commerce were aware of the procedural requirements upon which Congress conditioned the President's authority to act pursuant to Section 232.  Tellingly, the Secretary of Commerce complied with the procedural requirements of Sections 232 when he investigated the national security effects of certain steel mill products in 2017 and submitted the requisite report to the President on January 11, 2018.  *See The Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended* ("*Steel Report*"), attached as Exhibit 2 hereto.  The President then complied with the procedural requirements of Section 232 by issuing Proclamation 9705 imposing the 25 percent additional tariff on imports of steel mill products within the statutory deadlines.  *Adjusting Steel Imports Into the United States*, 83 Fed. Reg 11625 (March 15, 2018).

7.      Neither the Secretary's 2017 investigation nor the resulting *Steel Report* addressed nails or any other derivative article of steel.  Even if it had, Proclamation 9980 violated the statutory deadlines imposed by Section 232 because it was issued 744 days after the President received the *Steel Report* and 640 days after the President's authority to act based on it had lapsed.

8.      The President exceeded the authority delegated to him by Congress when he issued Proclamation 9980 in violation of Section 232's procedural deadlines.  Moreover, because the Secretary of Commerce and the President did not comply with the statute's procedural deadlines, Stanley, as an importer of derivative products subject to Proclamation 9980, was denied the equal protection of the laws as guaranteed by the Fifth Amendment's Due Process clause.

9.      Of direct consequence to this action, a three-judge panel of this court has held that the President issued Proclamation 9980 after his congressionally delegated authority to adjust imports of products identified in the Proclamation had expired.  *PrimeSource Building Products, supra.*  Accordingly, the court invalidated Proclamation 9980 as contrary to law.

<u>**JURISDICTION**</u>

10.     Section 232 is a law "providing for tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" as well as for "administration and enforcement with respect to" such tariffs, duties, or fees.  Thus, this action arises out of the administration and enforcement of matters referred to in 28 U.S.C. § 1581(i)(2) and (4).

11.     Proclamation 9980 does not constitute a determination reviewable under this court's jurisdiction established by 28 U.S.C. § 1581(a)-(h).  Accordingly, this court has subject

matter jurisdiction pursuant to 28 U.S.C. § 1581(i) and may order the relief requested herein

pursuant to 28 U.S.C. § 2643.

12.     The Administrative Procedure Act ("APA"), 5 U.S.C. § 702 provides this court

with jurisdiction to review federal agency actions brought by "person{s} suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of the relevant statute."  Stanley is adversely affected by Proclamation 9980 because it

pays the additional Section 232 duty on its imports of steel nails.

## TIMELINESS

13.     This action is timely brought within two years of January 24, 2020, the date on

which Proclamation 9980 was issued and Stanley's cause of action first accrued.  28 U.S.C. §

2636(i).

## THE PARTIES

14.     Plaintiff Stanley Black & Decker, Inc. is a publicly traded United States

corporation headquartered in New Britain, Connecticut.  Stanley is a Fortune 500 American

manufacturer, a seller of a wide variety of industrial tools, household hardware, consumer

appliances and other products, and a provider of security services.  Stanley operates more than

40 domestic facilities around the United States and has a work force in the United States of

approximately 17,000 employees.  Either directly or through its wholly-owned subsidiaries,

Stanley is an importer of steel nails that Proclamation 9980 identifies as derivative products.

Stanley therefore pays the 25 percent Section 232 tariff imposed pursuant to Proclamation 9980

and is the real party in interest.

15.     Defendant United States is the recipient of the Section 232 tariffs that are the

subject of this action and is the statutory defendant under 28 U.S.C. § 1581(i)(2) and (4).

16.     Defendant Joseph R. Biden, Jr. is the President of the United States.  At the time of the events complained of, the President of the United Stated States was Donald J. Trump, in which capacity he issued Proclamation 9980.  President Biden is sued in his official capacity only.

17.     Defendant United States Customs and Border Protection ("CBP") is the federal agency that administers and enforces the tariffs imposed under Section 232, including the tariffs imposed pursuant to Proclamation 9980.

18.     Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of Customs & Border Protection.  When Proclamation 9980 was issued, Mark A. Morgan was the Acting Commissioner of Customs & Border Protection, with responsibility for overseeing collection of Section 232 tariffs paid by Stanley.  Mr. Miller is sued in his official capacity only.

19.     Defendant United States Department of Commerce ("Commerce") is the federal agency responsible by statute for initiating and conducting investigations under Section 232 and for submitting the resulting findings and recommendations to the President of the United States.  Proclamation 9980 purports to respond to certain undisclosed "assessments" and "recommendations" made by Commerce.

20.     Defendant Gina M. Raimondo is the Secretary of the United States Department of Commerce.  When Proclamation 9980 was issued, Wilbur Ross was the Secretary of Commerce, and he was the individual charged by statute with responsibility conduct investigations and make reports pursuant to Section 232.  Secretary Raimondo is sued in her official capacity only.

## STANDING

21.     Stanley has standing to bring this action pursuant to 28 U.S.C. § 2631(i), which states that "any civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)-(h), may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5" (the APA).  Section 702 states that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

22.      Stanley directly or through one of its wholly-owned subsidiaries is the importer of record of steel nails subject to the 25 percent tariff imposed by Proclamation 9980. Consequently, Stanley has paid and continues to pay the 25 percent tariff imposed on its imports of nails by Proclamation 9980.  Further, Stanley suffered actual and irreparable harm from the proclamation because it was deprived of its right to provide written comments and testimony regarding the imposition of the 25 percent duties on its steel nails imports.  As a result, Stanley is a "person . . . adversely affected or aggrieved" by the issuance and implementation of Proclamation 9980, within the meaning of 5 U.S.C. § 702, and has suffered and continues to suffer actual and particularized injury resulting from the issuance and implementation of Proclamation 9980.

## STATEMENT OF FACTS

**Background: Section 232 of the Trade Expansion Act of 1962 Generally**

23.     Section 232, titled "Safeguarding National Security," authorizes the President, upon a "finding" that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," to take action "to adjust

the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).  Section 232 mandates the administrative process that must be followed before the President has authority to take such action. *Id*. at § 1862(b).

24.     The route to action taken under Section 232 begins when "the head of any department or agency," including the Secretary of Commerce, requests such action.  Upon such a request, the Secretary of Commerce "shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request." *Id*. at § 1861(b)(1)(A).  The Bureau of Industry and Security ("BIS") at the Commerce Department conducts Section 232 investigations in accordance with Commerce Department Regulations. 15 C.F.R., part 705.

25.     The Secretary of Commerce conducts the investigation in consultation with the Secretary of the U.S. Department of Defense ("Defense Secretary") and other federal officials, as appropriate, to determine the effects of the investigated imports on the national security. Specifically, the Secretary of Commerce shall "immediately provide notice to the Secretary of Defense of any investigation," shall "consult with the Secretary of Defense regarding the methodological and policy questions raised in any investigation," and, if appropriate, shall "hold public hearings or otherwise afford interested parties an opportunity to present information and advice." 19 U.S.C. §§ 1862(b)(1)(B); (b)(2)(A). The Defense Secretary "shall provide the Secretary {of Commerce} an assessment of the defense requirements of an article" under investigation. *Id*. at § 1862(b)(2)(B).

26.     Within 270 days after initiating a Section 232 investigation, the Secretary of Commerce "shall submit to the President" and publish in the Federal Register "a report on the

8

findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, the recommendations of the Secretary for action or inaction." *Id*. at § 1862(b)(3)(A). "If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report." *Id*.

27.     "Any portion of the report submitted by the Secretary {of Commerce} . . . which does not contain classified information or proprietary information shall be published in the Federal Register." *Id*. at 1862(b)(3)(B).

28.     A report by the Commerce Secretary that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security triggers the requirement that, within 90 days thereafter, the President "determine whether the President concurs in the finding of the Secretary" and if so, "determine the nature and duration of the action that, in the judgement of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id*. at § 1862(c)(1)(A)(i) and(ii).  If the Secretary's report does not contain a finding that an article is being imported in such quantities or under such circumstances as to threaten to impair the national security, the President has no authority to take any action pursuant to Section 232. *Id*.

29.     If the President concurs with the Commerce Secretary that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President must "implement" the action that he or she determines

must be taken to adjust the subject imports "by no later than the date which is 15 days after the date on which the president determines to take action." *Id*. at § 1862(c)(1)(B).

30.     Finally, the President must "submit to the Congress a written statement of the reasons" explaining his determination by "no later than the date that is 30 days after the date on which the President makes any determination." *Id*. at § 1862(c)(2).

**The Commerce Secretary's Investigation of Steel Articles Pursuant to Section 232**

31.     On April 19, 2017 Secretary of Commerce Wilbur Ross initiated an investigation pursuant to Section 232 into the effects of imports of certain steel articles on the national security of the United States.  As part of that investigation, Commerce solicited public statements, held a public hearing, and consulted with the Defense Secretary.  *Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel* 82 Fed. Reg. 19205 (April 26, 2017).

32.     Commerce's notice of investigation identified only steel mills products as subject articles.  It did not identify derivative articles such as steel nails as articles subject to the investigation.  Based on the notice's sole focus on steel mill products, Stanley had no reason to believe that its steel nails imports would be subject to the investigation or any resulting action by the President.

33.     On January 11, 2018, BIS issued the *Steel Report*, which expressly stated that the scope of the investigation was limited to certain steel mill products described and classified under subheadings 7206.10 through 7216.50, 7216.99 through 7302.10, 7302.40 through 7302.90, and 7304.10 through 7306.90 of the Harmonized Tariff Schedule of the United States ("HTSUS").  *Steel Report* at 21.  The articles described in the *Steel Report* did not include steel

nails, and steel nails are not classifiable under any of the HTSUS subheadings identified in the *Steel Report* as subject articles.

34.     The *Steel Report* observed that the steel industry in the United States was in decline, that shrinking capacity utilization rates were deterring capital investment, and that imports had contributed to the decline in domestic production of steel mill products.  *Steel Report* at 3-5. "{T}he Secretary of Commerce conclude{d} that the present quantities and circumstances of steel imports are responsible for a 'weakening of our internal economy' and threaten to impair the national security as defined in Section 232." *Id*. at 5.  The Secretary identified global excess steel capacity as a circumstance that contributes to the "weakening of our internal economy" and thus "threaten{s} to impair" the national security as defined in Section 232.  *Id*. at 5, 16.  The *Steel Report* explained that "U.S. steel production capacity has remained flat since 2001, while other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined."  *Id*. at 52.

35.     Commerce explained in the *Steel Report* that it had analyzed the impact of imports of the subject articles using a broad definition of "national security" that was not limited to "national defense," but also included "the general security and welfare of certain industries beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government." *Steel Report* at 1, 13-15.

36.     On February 18, 2018 the Defense Secretary sent a letter to Commerce stating his view that "U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production" and "therefore {the Defense Department} does not believe that the findings in the {*Steel Report*} impact the ability of {Defense Department} programs to acquire

the steel or aluminum necessary to meet national defense requirements." *Memorandum from Sec'y of Def. to Sec'y of Commerce re: Response to Steel and Aluminum Policy Recommendations*, dated February 18, 2018 ("*Defense Memo.*"); attached as Exhibit 3 hereto. The Defense Secretary also observed that the Defense Department "continues to be concerned about the negative impact on our keys allies" of the "recommended options within the reports." *Id*.

37.     The Secretary of Commerce nevertheless recommended that the President take immediate action to adjust the level of imports of the steel mill products identified in the *Steel Report* through quotas or tariffs. *Id*. at 58-61. The Secretary recommended three alternative actions, each of which had the stated objective of enabling the U.S. steel industry to operate at an average capacity utilization rate of 80 percent or better. *Id*. at 6-9.

38.     Neither the *Steel Report* nor the *Defense Memo* identified steel nails as an important element of the Defense Department's national defense requirements.

**The Original Proclamation on Steel Articles: Proclamation 9705**

39.     On March 8, 2018, President Donald J. Trump acted pursuant to Section 232 and in response to the *Steel Report*. *See* Proclamation 9705, attached as Exhibit 4 hereto. Proclamation 9705 imposed additional tariffs of 25 percent *ad valorem* on U.S. imports of certain steel mill articles.

40.     Proclamation 9705 stated that "Canada and Mexico present a special case" given their "shared commitment {with the United States} to support . . . each other in addressing national security concerns." *Id*. Therefore, the President "determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles

from Canada and Mexico is to continue ongoing discussions with these countries" and exempt

them from the tariff "at least at this time." *Id.*

     41.    The 25 percent additional tariffs were scheduled to take effect against imports

from all countries except Canada and Mexico on March 23, 2018.

     42.    Proclamation 9705 imposed additional tariffs on the following articles:

     a.   flat-rolled products provided for in HTSUS headings 7208, 7209, 7210, 7211, 7212, 7225, or 7226;

     b.   bars and rods provided for in headings 7213, 7214, 7215, 7227, or 7228; angles, shapes, and sections of {heading} 7216 (except subheadings 7216.61.00, 7216.69.00, or 7216.91.00); sheet piling provided for in subheading 7301.10.00; rails provided for in subheading 7302.10; fish plates and sole plates provided for in subheading 7302.40.00; and other products of iron or steel provided for in subheading 7302.90.00;

     c.   tubes, pipe, and hollow profiles provided for in heading 7304, or 7306; tubes and pipes provided for in heading 7305;

     d.   ingots and other primary forms and semi-finished products provided for in heading 7206, 7207, or7224; and

     e.   products of stainless steel provided for in heading 7218, 7219, 7220, 7221, 7222, or 7223.

*Id.* at 11629.

     43.    Proclamation 9705 made no reference to steel nails, to derivative articles of steel

generally, or to the specific derivative articles of steel later set out in Proclamation 9980.

     44.    The President subsequently exempted certain countries from the imposition of

tariffs on imports of articles pursuant to Proclamation 9705. *Adjusting Imports of Steel Into the*

*United States*, 83 Fed. Reg. 20683, 20685 (May 7, 2018) (Proclamation 9740 exempting South

Korea); *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857, 25858 (June 5,

2018) (Proclamation 9759 exempting Argentina and Brazil subject to quotas and exempting

Austral without quotas); *Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987, 23988 (May 23, 2019) (Proclamation 9894 exempting Canada and Mexico). As a result articles of steel from Argentina, Australia, Brazil, Canada, Mexico, and South Korea are currently exempt from the 25 percent tariff imposed by proclamation 9705.

**The Proclamation on "Derivative" Steel Articles: Proclamation 9980**

45.     Nearly two years after issuing Proclamation 9705, and without prior notice, the President issued Proclamation 9980 on January 24, 2020, imposing, *inter alia*, a 25 percent tariff on U.S. imports of certain "derivative" articles manufactured from steel, effective February 8, 2020. 85 Fed. Reg. 5281 (January 29, 2020).

46.     The President cited the *Steel Report* and his instructions in Proclamation 9705 directing the Secretary of Commerce to inform him of any further action needed under Section 232 as his legal authority to issue Proclamation 9980. *Id*.

47.     Proclamation 9980 states that further action under Section 232 is warranted because the Secretary of Commerce "informed" the President that the "domestic steel producers' capacity utilization has not stabilized for an extended period of time at or above . . . 80 percent." *Id*.

48.     Proclamation 9980 also states that the Secretary of Commerce "informed" the President that "{a}lthough imports of aluminum articles and steel articles {covered by the prior proclamations} have declined since the implementation of the tariffs and quotas {imposed pursuant to those proclamations} . . . imports of certain derivatives of aluminum articles and imports of certain derivatives of steel articles have significantly increased," and that the "net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of aluminum and steel." *Id*.

14

49. Proclamation 9980 further states that "{i}t is the Secretary's assessment that foreign producers of these derivative articles have increased shipments of such articles to the United States to circumvent the duties on aluminum articles and steel articles imposed in Proclamation 9704 and 9705, and that imports of these derivative articles threaten to undermine the action taken to address the risk to the national security of the United States found in Proclamation 9704 and Proclamation 9705." *Id.*

50. Proclamation 9980 imposed 25 percent tariffs on the following derivative articles of steel:

> a. Nails, tacks (other than thumb tacks), drawing pins, corrugated nails, staples (other than those of heading 8305) and similar articles, of iron or steel, whether or not with heads of other material (excluding such articles with heads of copper), suitable for use in powder-actuated handtools, threaded (described in subheading 7317.00.30);
>
> b. Nails, tacks (other than thumb tacks), drawing pins, corrugated nails, staples (other than those of heading 8305) and similar articles, of iron or steel, whether or not with heads of other material (excluding such articles with heads of copper), of one piece construction, whether or not made of round wire; the foregoing described in statistical reporting numbers 7317.00.55.03, 7317.00.55.05, 7317.00.55.07, 7317.00.55.60, 7317.00.55.80, or 7317.00.65.60 only and not in other statistical reporting numbers of subheadings 7317.00.55 and 7317.00.55.65;
>
> c. Bumper stamping of steel, the foregoing comprising parts and accessories of the motor vehicles of headings 8701 to 8705 (described in subheading 8708.10.30); and
>
> d. Body stampings of steel, for tractors suitable for agricultural use (described in subheading 8708.29.21.

*Id.* at 5290-91

51. These tariffs do not apply to derivative articles of steel from countries previously exempted from the 25 percent tariff imposed by Proclamation 9705; *i.e.*, Argentina, Australia, Brazil, Canada, Mexico, and South Korea.  Proclamation 9980 provided no rationale for

exempting derivative articles of steel from Argentina, Australia, Brazil, Canada, Mexico, and South Korea.

52.     These articles were selected because they met the following criteria set forth in Proclamation 9980: (a) the aluminum or steel article represents, on average, two-thirds or more of the total cost of materials of the derivative article; (b) import volumes of the derivative article increased year-to-year since June 1, 2018 . . . in comparison to the import volumes of such derivative article during the two preceding years; and (c) import volumes of such derivative article following imposition of the tariffs exceeded the 4 percent average increase in the total volume of goods imported into the United States during the same period since June 1, 2018. *Id*. at 5282.

**Proclamation 9980 Was Not Authorized Pursuant to Section 232**

53.     The President promulgated Proclamation 9980 more than 600 days after the window for him to take action had closed.  This action constitutes a clear violation of the statutory constraints on his authority imposed by Section 232.  *See Transpacific Steel v. United States*, 2019 Ct. Int'l Trade LEXIS 142 at *11 (November 15, 2019) ("the statute  . . . cabins the President's power . . . procedurally, by setting the time in which to act").

54.     The Secretary of Commerce did not make available to the public any information that he may have provided to the President pursuant to Section 232 that could have supported the President's promulgation of Proclamation 9980.

55.     The Secretary of Commerce did not investigate the effect of imports of derivative articles of steel or aluminum on the national security of the United States under Section 232, nor did he submit to the President a report of such investigation.

56.     Neither BIS's investigation into the effects of imports of certain steel mill articles on the national security of the United States nor the resulting *Steel Report*, on which Proclamation 9980 purports to rely, involved any of the derivative articles of steel subject to Proclamation 9980, or derivative articles of steel generally.

57.     Pursuant to Section 232, BIS was required to complete its investigation within 270 days of April 19, 2017, a period that expired on January 14, 2018.  Section 232 does not authorize the Commerce Secretary to make additional finding or recommendations to the President regarding the April 19, 2017 investigation after that date.

58.     The *Steel Report* was published more than two years earlier than the date on which Proclamation 9980 was promulgated.

59.     Pursuant to Section 232, the President was required to announce the nature and duration of any remedial actions to be taken based on the *Steel Report* within 90 days of the issuance of the *Steel Report*, a period that expired on April 11, 2018.  Section 232 does not authorize the President to make additional determinations or to take any additional remedial actions based on the *Steel Report* after that date.

60.     Through Proclamation 9705, the President announced his determination based on the *Steel Report* on March 8, 2018 and implemented remedial action on March 23, 2018. Pursuant to Section 232, the President was required to implement any action based on Proclamation 9705 within 15 days of March 8, 2018, a period that expired on March 23, 2018. Section 232 does not authorize the President to implement remedial actions pursuant to Proclamation 9705 after that date.

**The Tariffs Imposed On Derivative Products Are Not Rationally Related to the Purported Threat to the National Security of the United States**

61.      Proclamation 9980 sets out no findings that the performance of any United States industry producing any of the identified derivative articles of steel – including steel nails – had experienced economic decline.

62.      Proclamation 9980 sets out no findings showing the effect on the national security of the United States based on the economic decline of any domestic industry producing one or more of the identified derivative articles of steel – including steel nails.

63.      Proclamation 9980 identified only one reason supporting its conclusion that imports of the derivative articles pose a threat to national security: importation of derivative articles, in lieu of domestic manufacturing of such derivative articles, depresses demand for domestic articles of steel that could be used in the domestic production of derivative articles. The derivative articles of steel identified in Proclamation 9980, however, represent a negligible portion of total U.S. imports of derivative articles of steel and a negligible portion of the total U.S. market for derivative articles of steel.

64.      Proclamation 9980 omitted numerous derivative articles of steel that represent a far greater portion of overall U.S. imports of derivative articles of steel and a far greater portion of the overall U.S. market for derivative articles of steel.  For example, imports of stranded steel wire and other articles classified under HTSUS heading 7312 – which are not subject to Proclamation 9980 – from countries other than Argentina, Australia, Brazil, Canada, Mexico, and South Korea account for about three percent by value of imports of all derivative articles from countries other than Argentina, Australia, Brazil, Canada, Mexico, and South Korea.

65.      Moreover, in selecting the derivative articles of steel identified in Proclamation 9980, the President did not apply the criteria set forth in Proclamation 9980, which purported to

apply to any derivative articles of steel with respect to which: (a) steel represents, on average, two-thirds or more of the total cost of materials of the derivative product; (b) import volumes of such derivative article increased year-to-year since June 1, 2018, in comparison to import volumes of such derivative article during the two preceding years; and (c) import volumes of such derivative article following the imposition of the tariffs exceeded the four percent average increase in the total volume of goods imported into the United States during the same period since June 1, 2018.  For example, stranded steel wire and other articles classifiable under HTSUS heading 7312 are articles for which the steel content represents, on average, more than two-thirds of the total cost of materials and for which the value of imports increased by 41 percent over the twenty-four month period, and 28 percent over the twelve-month period, ending June 1, 2019. Such derivative articles were not included in the scope of the derivative articles subject to the 25 percent tariff under Proclamation 9980.

66.     Proclamation 9980 provides no rationale for exempting derivative articles imported from Argentina, Australia, Brazil, Canada, Mexico, and South Korea.

67.     Articles of steel from these countries were exempted from the tariffs imposed by Proclamation 9705 based on quotas imposed on such articles or on other agreements between the United States and each exempted country as to trade in such articles.  Proclamation 9980, however, does not impose quotas on derivative articles of steel from Argentina, Australia, Brazil, Canada, Mexico, and South Korea, nor does Proclamation 9980 indicate any on-going negotiations with Argentina, Australia, Brazil, Canada, Mexico, or South Korea that would otherwise mitigate any effect that importation of derivative articles from these countries might otherwise have.

68.     The exemptions applicable to derivative articles from Argentina, Australia, Brazil, Canada, Mexico, and South Korea account for about 40 percent of imports of those derivative articles into the United States.  *See* Chad P. Bown, *Trump's Steel and Aluminum Tariffs are Cascading Out of Control*, Peterson Institute For International Economics (February 4, 2020), attached as Exhibit 5 hereto.

## STATEMENT OF CLAIMS

## COUNT I – *ULTRA VIRES* ACTS

69.     Paragraphs 1 through 68 are incorporated herein by reference.

70.     Congress has the exclusive "power to lay and collect taxes, duties, imports, and excises" and "to regulate Commerce with foreign nations." U.S. Constitution, Art 1, § 8.

71.     Through Section 232, Congress has delegated to the President certain authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

72.     Section 232 comprises the President's only statutory authority to regulate commerce with foreign nations in response to imports into the United States when those imports are in such quantities or under such circumstances as to threaten to impair the national security of the United States.

73.     The President has no independent constitutional authority to regulate commerce with foreign nations in response to imports into the United States when those imports are in such quantities or under such circumstances as to threaten to impair the national security of the United States.

20

74.     Section 232 mandates the procedure that the Secretary of Commerce and the President must follow before the President has authority to take any action to adjust imports into the United States when those imports are in such quantities or under such circumstances as to threaten to impair the national security of the United States.

75.     Section 232 also mandates the determinations that the Secretary of Commerce and the President must make before the President has authority to take any action with respect to imports into the United States when those imports are in such quantities or under such circumstances as to threaten to impair the national security of the United States.

76.     With respect to the Secretary of Commerce, Section 232 requires that the Secretary "immediately initiate an appropriate investigation," and "immediately provide notice to the Secretary of Defense;" that "in the course of {the} investigation" the Secretary shall "consult with the Secretary of Defense" and "appropriate officers of the United States," if appropriate, and "after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice;" and "no later than . . . 270 days after the date on which {the} investigation is initiated . . ., submit to the President a report on the findings of sch investigation," which "shall be published in the Federal Register" except for any portion that contains classified or proprietary information.  19 U.S.C. § 1682(b)(2)-(3).

77.     With respect to the President, Section 232 requires that "within 90 days after receiving a report" under Section 232 in which the Secretary of Commerce finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President shall "determine whether {he} concurs" and, if so, "determine the nature and duration of the action that . . . must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the

national security." 19 U.S.C. § 1682(c)(1)(A). The President must then implement any such action "no later than the date that is 15 days after the day on which the president determines to take action." *Id*. at § 1682(c)(1)(B).

78.     Instead of conforming to this statutorily mandated process, the Secretary of Commerce merely "informed" the President that domestic steel and aluminum capacity utilization had not stabilized at or above the 80 percent level, "informed" the President that imports of certain derivative articles of steel and aluminum had increased, made an "assessment" that such imports of these derivative articles "threaten to undermine the actions taken" by the President in Proclamations 9704 and 9705, and "assessed" that reducing imports of certain derivative articles would "address the threatened impairment of the national security of the United States." 85 Fed. Reg. 5281-82

79.     The Secretary of Commerce did not provide the President with such "information" or make such "assessments" pursuant to an investigation conducted under Section 232 prior to promulgation of Proclamation 9980, nor had the Secretary done so in any report submitted within 270 days of the initiation of an investigation under Section 232.

80.     No record evidence exists that the Secretary of Commerce notified or consulted with the Secretary of Defense or any other officer of the United States prior to the President promulgating Proclamation 9980, as Section 232 requires.

81.     The Secretary of Commerce did not notify the public or afford interested parties an opportunity for public comment on the issue before the President promulgated Proclamation 9980.

82.     No portion of the Secretary of Commerce's "information" or "assessment" was published in the Federal Register or any other place.

83.     The Secretary of Commerce thus failed to comply with any of the procedures mandated by Section 232.

84.     The "information" provided by the Secretary of Commerce and the "assessment" made by him were acts taken outside his legal authority.  As such, they did not comprise an action under Section 232 on which the President could adjust imports of an article and its derivatives so that such imports would not threaten to impair the national security of the United States.

85.     The Secretary of Commerce submitted the *Steel Report* to the President in January 2018 – more than two years before the President promulgated Proclamation 9980.  The *Steel Report* cannot form the basis for Proclamation 9980 because the time elapsed between the *Steel Report* and Proclamation 9980 far exceeds the 90 days permitted by Section 232 for the President to announce the nature and duration of any remedial action.

86.     The President promulgated Proclamation 9980 on January 24, 2020, nearly two years after the President promulgated Proclamation 9705 on March 8, 2018.  Proclamation 9705 cannot comprise the basis for Proclamation 9980 because the time elapsed between Proclamation 9705 and Proclamation 9980 far exceeds the fifteen days permitted by Section 232 for implementing any remedial action determined by the President.

87.     The issuance, implementation, and enforcement of Proclamation 9980 thus violates the requirements mandated by Section 232.

## COUNT II – ADMINISTRATIVE PROCEDURE ACT

88.     Paragraphs 1 through 87 are incorporated herein by reference.

89.      The "assessment" the Secretary of Commerce and the "information" provided to the President by him were arbitrary and capricious and otherwise not in accordance with law in

violation of 5 U.S.C. § 706(2)(A) because the Secretary of Commerce did not investigate the effect of imports of derivative articles of steel or aluminum on the national security of the United States under Section 232, nor did he submit to the President a report of such investigation and utterly failed to provide a reasoned basis for his assessment.

90.     The Secretary stated no basis for his "assessment" beyond the Steel Report completed two years earlier that did not evaluate the impact of derivative articles of steel.

91.     Accordingly, the Secretary's "assessment" and "information" concerning derivative steel products, including steel nails, are arbitrary and capricious and otherwise not in accordance with law.

## COUNT III – EQUAL PROTECTION

92.     Paragraphs 1 through 91 are incorporated herein by reference.

93.     Equal protection under the laws of the United States is guaranteed by the Fifth Amendment's Due Process requirement, which prohibits the government from unjustifiably treating similarly situated persons differently.  *Bolling v. Sharpe*, 347 U.S. 497,499 (1954).  A classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relationship to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012).

94.     Stanley is in all relevant respects similarly situated to importers in the United States of derivative articles of steel that are (a) not subject to the 25 percent tariff, despite such derivative articles meeting the three criteria for inclusion identified by the President in Proclamation 9705, or (b) are listed in Proclamation 9980 but exempt from the 25 percent tariff because they are imported from Argentina, Australia, Brazil, Canada, Mexico, or South Korea.

95.     Proclamation 9980 purports to remove the threatened impairment of the national security of the United States by adjusting imports of derivative articles of steel that could displace demand for domestic steel mill articles used to manufacture such derivative articles. The inclusion of steel nails as derivative articles subject to Proclamation 9980, while other derivative articles are exempt from Proclamation 9980 despite (a) meeting the three criteria for inclusion set forth on Proclamation 9980 and (b) despite displacing a greater portion of domestic demand for articles of steel than do imports of steel nails, is not rationally related to the stated purpose of Proclamation 9980.

96.     The inclusion in Proclamation 9980 of certain derivative articles of steel manufactured in certain countries and the exclusion of identical derivative articles of steel from Argentina, Australia, Brazil, Canada, Mexico, and South Korea despite the fact that derivative articles of steel manufactured in some of the exempted countries displace a greater portion of domestic demand for articles of steel is not rationally related to the stated purpose of Proclamation 9980.

97.     Because it serves no legitimate governmental purpose to include Stanley's nails within Proclamation 9980 but exclude imports of steel articles that are similarly situated under the Secretary of Commerce's "assessment," Proclamation 9980 violates Equal Protection and is unconstitutional.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for this Court to:

(1) Enter judgement in favor of Stanley Black & Decker, Inc. and its subsidiaries, and declare Proclamation 9980 null and void;

(2) Permanently enjoin Defendants from enforcing Proclamation 9980 against Stanley Black & Decker and its subsidiaries;

(3) Order U.S. Customs & Border Protection to refund to Stanley Black & Decker and its subsidiaries any duties collected pursuant to Proclamation 9980 with interest as provided by law; and

(4) Grant such other additional relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Lawrence J. Bogard*

_____
Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1400 16th Street. N.W., Suite 350
Washington, D.C.  20036
(202) 776-1150
lbogard@npwdc.com

Attorneys for Plaintiff

May 27, 2021